IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL JOHNSON, | |
| Plaintiff, | Case No. 15 C 11540 |
| v. | Judge Harry D. Leinenweber |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Defendant Ford Motor Company moves for summary judgment (Dkt. No. 60) against Plaintiff Samuel Johnson on all of his claims. For the reasons stated herein, the Motion is granted.

## I.  BACKGROUND

The following facts are undisputed unless designated otherwise. Ford Motor Company ("Ford") is a Michigan corporation that maintains the Chicago Stamping Plant (the "Plant"), which makes automotive parts for assembly plants and is located in Chicago, Illinois. (Pl.'s Resp. to Def.'s Stmt. of Material Facts ("SOF") ¶ 1, Dkt. No. 70.) Plaintiff Samuel Johnson ("Johnson"), an African-American, worked at the Plant from sometime in September 2012 to May 6, 2014. (SOF ¶ 2.) During that time, Johnson experienced several personal setbacks, including the

deaths of his grandparents and cousin. (Def.'s Resp. to Pl.'s Stmt. of Additional Material Facts ("SOAF") ¶ 1, Dkt. No. 74.) These setbacks, along with what Johnson alleges were various forms of harassment and discrimination by Ford employees, caused him to suffer panic attacks, stress, and anxiety.

On at least two occasions, Johnson visited the Plant's on-site Medical Department, complaining of chest pain, stress, and anxiety, as well as requesting and eventually taking an ambulance to the hospital. (SOF ¶¶ 9-10, 17-19; SOAF ¶¶ 6, 9-11.) During Johnson's first visit to the hospital, a doctor informed him that he was experiencing anxiety. (SOF ¶ 10.) Sometime soon afterward, his personal doctor requested Johnson be permitted leave from work due to his "adjustment disorder with anxiety," which made Johnson "unable to perform any kind of work activities." (SOF ¶ 12.) Johnson's doctor also referred him to a psychiatrist for treatment. (*Id.*) In accordance with his personal doctor's orders, he was also subsequently placed on one-month medical leave, pending clearance by a psychiatrist to return to work. (SOF ¶ 13.) Johnson later received that clearance from psychiatrist Dr. Kirk Hopkins, who diagnosed him with "Major Depression." (SOF ¶ 15-16.) He returned to work on March 28, 2014. (*Id.*)

The bulk of Johnson's claims arise out of one other occasion when Johnson visited the Medical Department, which took place on April 4, 2014. As this point, the parties' stories diverge as to what exactly happened that day. Johnson met with the resident nurse, Ms. Denise Bombagetti, complaining of chest pain. (SOF ¶ 19.) He requested an ambulance, but Ms. Bombagetti denied him that service, so he called for one himself. (SOAF ¶ 9-11.) Ford does not dispute these facts but offers additional controverted facts: in Johnson's meeting with Ms. Bombagetti, he also complained about his anxiety and about other individuals bothering him while working. (SOF ¶ 20.) He allegedly informed the nurse that he did not want to discuss the situation with his United Auto Workers' Union Employee Support Services Program representative, Leroy Washington. (SOF ¶¶ 6, 21.) The nurse took Johnson's blood pressure and pulse, and checked his respiration and pupils, which she claimed all looked normal. (SOF ¶ 22.) She determined that an ambulance was not warranted and instead suggested that Johnson speak with the resident doctor. (SOF ¶ 23, 27.) Johnson refused and in an agitated manner left the Medical Department, which led Ms. Bombagetti to believe Johnson posed a threat of violence. (SOF ¶ 26.) Ms. Bombagetti then discussed the incident with Mr. Washington and other officials and submitted a recommendation that Johnson not be

allowed to return to work until he completed a fit for duty examination. (SOF ¶ 30-32.)

Both parties agree that Johnson went to the hospital on April 4, 2014, and doctors there informed Johnson that he was again experiencing anxiety. (SOF ¶ 34.) However, upon his return to the Plant, the parties' stories once again diverge. Johnson contends that the Plant's security guards stopped him from entering, frisked him, and requested his medical paperwork. (SOAF ¶ 14.) Ford disagrees that the security guard laid a finger on Johnson. (*Id.*) Although the minute details are disputed, both parties agree that Ms. Bombagetti required that Johnson see a counselor or his psychiatrist to determine whether he was fit for duty before returning. (SOAF ¶ 15-17.) Ms. Bombagetti provided Johnson with a so-called "Unicare Disability" form, which Ford contends is a standard procedure for employees leaving work for a medical issue and then possibly requesting medical leave. (SOAF ¶ 19.) As a result, Johnson saw his psychiatrist, who declared him "totally disabled" and unable to work at the time. (SOAF ¶ 24.)

Around April 10, 2014, Johnson filed his first Charge of Discrimination ("First Charge") against Ford with the Illinois Department of Human Rights ("IDHR"). (SOF ¶ 47.) That Charge addressed solely the events that occurred on April 4, 2014. (SOF

¶ 48.) He later filed a second Charge of Discrimination ("Second Charge") on May 12, 2014, which concerned his return to and subsequent resignation from work.

Johnson's psychiatrist later cleared him to return to work on May 1, 2014. (SOAF ¶ 24.) He worked for approximately one week before resigning. (SOF ¶ 61.) The Court notes that the facts underlying Johnson's resignation are somewhat inconsistent and even confusing, but to provide context: Johnson's union representative Matt Kolinowski and the Plant's Labor Relations Representative James Pipkins allegedly threatened him to withdraw his First Charge or risk retaliation. (SOAF ¶ 26.) Ford disputes this, stating that Mr. Pipkins did not threaten Johnson and instead, as both parties agree, informed him that he did not have to resign. (SOF ¶ 64-64.) Regardless of what was said and done, Johnson ultimately resigned and allegedly believed he had no other option but to resign. (SOAF ¶ 26.)  In his Second Charge, Johnson raised a retaliation claim based on the events that occurred after returning to work on May 1, 2014 and leading up to his resignation. (SOF ¶ 68.) Around this time, he also applied for and received Social Security disability benefits, claiming that he was unable to work due to a disability. (SOF ¶ 61.)

As a final matter, Johnson brings an additional claim separate from the events described in the First and Second Charge. Leading up to the April 4, 2014 incident, Johnson contends that he also experienced a hostile work environment. Three of Johnson's supervisors—Rich Murry, Henry Snorek, and Brad Vis (all white males)—allegedly told Johnson that he was not performing well at his job, accused him of being on drugs, and questioned his frequent use of the bathroom. (SOAF ¶¶ 2-4.) Moreover, a co-worker called him a monkey. (SOAF ¶ 5.) Ford controverts the supervisors' alleged conduct and asserts that there is no proof that Johnson's co-worker called him such a name. (SOAF ¶ 5.)

The foregoing events led Johnson to bring this suit, which includes claims for race discrimination, a hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and a claim for perceived disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Ford now moves for summary judgment on all claims.

## II.  <u>ANALYSIS</u>

In considering Ford's Motion for Summary Judgment, the Court construes all facts and reasonable inferences in the light most favorable to Johnson. *See Harney v. Speedway SuperAmerica,*

*LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). But the Court does not extend this favor to inferences "that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (internal quotation marks and citation omitted). Summary judgment is appropriate when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); *see* FED. R. CIV. P. 56(a).

### A.  Counts I and III: Title VII Claims

The Court turns first to Johnson's Title VII claims, which include race discrimination, a racially hostile work environment, and retaliation. Each will be discussed in turn.

### 1.  *Race Discrimination Claim*

Johnson argues that Ford discriminated against him on the basis of his race. When considering employment discrimination, courts in this Circuit ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018). Courts use the familiar *McDonnell-Douglas* burden-shifting framework to evaluate the evidence in

the record. *See David v. Bd. of Trs. of Cmt. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). To establish *prima facie* discrimination, Johnson must show that (1) he is a member of a protected class; (2) he performed reasonably on the job in accord with Ford's legitimate expectations; (3) he was subjected to an adverse employment action despite his reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by Ford. *Johnson*, 892 F.3d at 895. If Johnson satisfies that burden, then Ford must "articulate a legitimate, nondiscriminatory reason for the adverse employment action," at which point the burden shifts back to Johnson to submit evidence that Ford's explanation is "pretextual." *David*, 846 F.3d at 225 (internal quotation marks and citation omitted).

Johnson admits that he cannot prove all of the elements to succeed on his race discrimination claim. Though unquestionably a member of a protected class, Johnson acknowledges that "he cannot identify any similarly situated individuals outside his protected class (white) that were treated more favorably than he was[.]" (Pl.'s Resp. to Def.'s Mot. for Summ. J. 6, Dkt. No. 72.) Because he concedes as much, and the record provides no evidence to demonstrate otherwise, Johnson cannot prove the fourth and final element of his race discrimination claim. *See Nichols v.*

*Mich. City Plant Planning Dep't*, 755 F.3d 594, 605 (7th Cir. 2014) (finding that the plaintiff's "claim fails because he cannot show that similarly situated employees that are not African-American received more favorable treatment"). His claim thus fails as a matter of law.

### 2. *Racially Hostile Work Environment Claim*

To survive summary judgment on his hostile work environment claim, Johnson must show that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

Johnson points to a handful of incidents which he contends created a hostile work environment. As recited in his First and Second Charges, Johnson cites the events that occurred on April 4, 2014, and the circumstances of his resignation. Beyond that, Johnson contends that his supervisors' conduct—namely, questioning his frequent bathroom use, telling him he was performing poorly, and accusing him of drug use—as well as one coworker calling him a monkey contributed toward such a hostility. As a preliminary matter, Ford argues that because Johnson's Charges never mentioned these latter events they

cannot be considered. Still, Ford maintains that whether or not the Court considers them, Johnson cannot establish all of the elements of a hostile work environment claim. These two arguments will be considered separately.

### a. *Allegations Outside the First and Second Charges*

It is clearly established that filing a charge with the Equal Employment Opportunity Commission ("EEOC") is "a necessary precondition to filing civil claims under Title VII." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 831 (7th Cir. 2015). Filing a charge with IDHR suffices as the charge is subsequently cross-filed with the EEOC as a matter of course. *See Watkins v. City of Chicago*, No. 17 C 2028, 2018 WL 2689537, at *4 (N.D. Ill. June 5, 2018). Ford correctly points out that Title VII claims not included in the charge are generally barred. *See Jones v. Res-Care*, 613 F.3d 665, 670 (7th Cir. 2010). But there is an exception. *Id.* Johnson may proceed on claims that share a "reasonable relationship between the allegations in the charge and the claims in the complaint" and that can "reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.* (internal quotation marks and citation omitted).

Here, Johnson's allegations in the First and Second Charges include race-discrimination and retaliation, as well as

instances where a supervisor or Ms. Bombagetti allegedly mistreated him. These allegations, by themselves, could serve as the basis for a hostile work environment claim. The additional facts and allegations Johnson sets forth regarding his other supervisors and co-worker bear a reasonable relationship with Johnson's allegations in the two Charges. Moreover, such claims can reasonably be expected to grow out of an investigation of said Charges. The Court will thus consider the additional allegations in its analysis.

### b. The Claim

Ford argues that Johnson's claim nevertheless fails as a matter of law because he cannot show that (1) the environment was both subjectively and objectively offensive, (2) any harassment he experienced was based on his race, and (3) the conduct was severe or pervasive. On this point, the Court agrees.

Notably, the law "does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998). As such, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Silk v. City of Chicago*, 194 F.3d 788, 803 (7th Cir. 1999) (internal quotation marks and citation omitted). A workplace rises to the level of an objectively

hostile work environment only if it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). "[T]he threshold for plaintiffs is high, as the workplace that is actionable is one that is hellish." *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (internal quotation marks omitted).

Taking the facts in the light most favorable to Johnson, the Court finds the alleged harassment against Johnson was neither objectively offensive nor pervasive. The harassment was infrequent and mostly confined to two separate days: April 4, 2014, and the day he resigned. In addition to those two dates were a few somewhat isolated incidents where some supervisors accused Johnson of drug use and questioned his frequent bathroom use, as well as where a co-worker called him a name. Looking at the totality of the circumstances, Johnson has shown at best a handful of insensitive and passive aggressive peers, not conduct that is truly outrageous. *See Kelly v. Dep't of Human Servs.*, No. 13-cv-03701, 2018 WL 5994930, at *7 (N.D. Ill. Nov. 15, 2018).

Moreover, Johnson has failed to show that any of the harassment he experienced was based on his race. The fact that Johnson is black, and his supervisors and Ms. Bombagetti are white does not suffice to establish that he was harassed because of his race. *See Collins v. Buechel Stone Corp.*, 390 F. Supp.2d 810, 815 (E.D. Wis. 2005) ("The mere fact that most of the harassment was committed by persons of a race other than [the plaintiff's] does not mean that race was the motivating factor."); *see also Orton-Bell v. Indiana*, 759 F.3d 768, 775 (7th Cir. 2014) ("[The plaintiff's] supervisors' insensitive and inattentive responses were callous mismanagement; but absent evidence that this inaction was based on her [protected characteristic], it did not violate Title VII."); *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 569 (7th Cir. 2012) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of [a protected characteristic]."). The only incident Johnson describes as having a connection to his race is when one coworker allegedly called him a monkey. The remark, however, while gross was not "an incessant part of the workplace environment." *Jackson v. Cnty of Racine*, 474 F.3d 493, 499 (7th Cir. 2007); *see also Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016) (finding that "three arguably race-tinged remarks [(including "get the

monkeys off the backs of management")] did not rise to the level of severe or pervasive conduct"). As such, and in sum, it follows that there is no triable issue of fact as to Johnson's hostile work environment claim. The claim thus fails as a matter of law.

### 3. *Retaliation Claim*

To prevail on his retaliation claim, Johnson must prove that (1) he engaged in a statutorily-protected activity; (2) he suffered an adverse employment action; and (3) there was causation (the former caused the latter). *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015).

Johnson engaged in a protected activity when he filed his First IDHR Charge. But Ford contends that Johnson has not offered evidence of a materially adverse action. For retaliation, the challenged adverse action "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Ill. Dep't of Trans.*, 474 F.3d 455, 461 (7th Cir. 2009) (citation omitted).

Here, Johnson contends that Mr. Pipkins and Mr. Kolinowski retaliated against him by harassing him to withdraw his First Charge. Moreover, Mr. Pipkins allegedly informed Johnson that if he did not withdraw the Charge, his superiors would also harass him and even terminate him. The Seventh Circuit has made

clear that statements pressuring an employee to drop discrimination charges do not constitute a materially adverse employment action. *Burton v. Bd. of Regents of Univ. of Wis.*, 851 F.3d 690, 697 (7th Cir. 2017) (finding that "the pressure to drop the suit could not have amounted to a materially adverse action because the statements did not cause any injury" (internal quotation marks and citation omitted)). So, the sole issue becomes whether a threat to terminate Johnson rises to the level of an adverse action.

The Seventh Circuit recognizes that while "unfulfilled threats of discipline" are not actionable, *id.* (citing *Poullard*, 829 F.3d at 856-57), claims may lie for constructive discharge. *Chapin v. Fort-Rohr Motors*, 621 F.3d 673, 679 (7th Cir. 2010). Constructive discharge occurs "when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004). This Circuit has recognized two types of constructive discharge: (1) when an employee resigns due to allegedly discriminatory harassment and (2) when an employer's conduct communicates to a reasonable employee that he will be terminated. *Chapin*, 621 F.3d at 679.

Here, Johnson alleges the latter, namely that Mr. Pipkins and Mr. Kolinowski threatened him with termination if he did not withdraw his First Charge. To prevail on this type of constructive discharge, Johnson must "show that his working conditions had become intolerable." *Id.* But, to qualify, such a condition "does not become intolerable or unbearable merely because a prospect of discharge lurks in the background." *Id.* (citing *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)).

The facts of *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673 (7th Cir. 2010), are very similar to the instant case. In *Chapin*, the plaintiff's manager threatened to fire him unless he withdrew his EEOC charge. *Id.* at 680. The plaintiff believed he was automatically terminated and felt he could not return to work. *Id.* at 678. The employer, however, explained to the plaintiff that he was not terminated and that the company wanted him to remain working. *Id.* at 680. That court ultimately held that the plaintiff's claim failed as a matter of law, reasoning:

> If [the plaintiff] had returned to work, without having withdrawn the EEOC charge, perhaps [the manager] would have fired him. Or, his supervisors or coworkers may have constantly harassed him to the point where his safety was at risk. [The manager] may also have done nothing. Any of these possibilities would require speculation on our part, as would a finding that the workplace would have become intolerable if [the plaintiff] had resumed his

> position, because [the plaintiff] unilaterally gave up
> his position.

*Id.* (internal quotation marks and citation omitted).

Here, construing all the facts in Johnson's favor, no reasonable employee standing in Johnson's shoes would believe that had he not resigned, he would have been immediately fired. As was the case in *Chapin,* there is no certainty that if Johnson continued to work his manager would have ultimately terminated him. Johnson returned to work for several days after he filed the First Charge and no disciplinary or other procedures commenced against him in an effort to terminate him. Even in response to Johnson's resignation, Mr. Pipkins asked Johnson if he was sure he wanted to resign and informed him that he did not have to do so. All the above aside, even if such termination had occurred, it is unclear whether the termination would have resulted for some reason other than the filing of his First Charge—for example, poor work performance. The Court would have to speculate on "what ifs," which it lacks the position to do here. *Cigan*, 388 F.3d at 333-34. As such, this "is not a case where the handwriting was on the wall and the plaintiff quit just ahead of fall of the axe." *Chapin*, 621 F.3d at 680 (internal quotation marks and citation omitted). Accordingly, Johnson's retaliation claim fails.

In sum, Ford is entitled to judgment as a matter of law on all of Johnson's Title VII claims.

### B. Count II: ADA

Johnson also brings a claim under the ADA. "The ADA imposes liability on employers who discriminate in the terms and conditions of a qualified individual's employment on the basis of a disability and requires that employers make reasonable accommodations for qualified individuals disabilities." *Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 683 (7th Cir. 2018) (citing 42 U.S.C. § 12112(a), (b)(5)(A)). "The ADA also prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA, such as filing a Charge of Discrimination with the EEOC or requesting reasonable accommodations." *Rowlands v. United Parcel Serv.-Ft. Wayne*, 901 F.3d 792, 798 (7th Cir. 2018).

Johnson claims that Ford discriminated against him in violation of the ADA by preventing him from returning to work on April 4, 2014, and by requiring him to undergo a fitness-for-duty examination based on a perceived disability. Under the ADA, the term "disability" includes "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subject to an

action prohibited under this chapter because of an actual or perceived physical mental impairment whether or not the impairment limits or is perceived to limit a major activity." *Id.* § 12102(3)(A).

The Seventh Circuit has determined that "where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may, depending on the circumstances of the particular case, require specific medical information from the employee and may require that the employee undergo a physical examination designed to determine his ability to work." *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also Taylor v. General Motors, LLC*, No. 15-10529, 2016 WL 1223358, at *8 (E.D. Mich. Mar. 29, 2016) (finding that "numerous courts have recognized that employers do not run afoul of the disability discrimination laws merely by asking an employee to undergo a mental health evaluation in response to observed behaviors"). Given Johnson's repeated visits to the Medical Department and then the hospital, as well as his subsequent diagnosis and medical leave of absence, the nurse's request for a fitness-for-duty examination was reasonable. *See Koszuta v. Office Depot, Inc.*, No. 16 C 2679, 2018 WL 1769368, at *12 (N.D. Ill. April 12, 2018) (granting

summary judgment against perceived disability claim where employer had legitimate basis for requiring fitness-for-duty examination after, *inter alia,* the plaintiff took "an extended leave of absence" and his co-workers "reported witnessing him engage in unusual or aggressive behavior"). The undisputed facts "paint a consistent picture of genuine concern that [Johnson's] behavior was uncharacteristic and adversely impacting [his] ability to perform [his] job." *Coffman v. Indianapolis Fire Dept.*, 578 F.3d 559, 566 (7th Cir. 2018). As such, Johnson has failed to show that he was "regarded as" having a disability under the ADA.

Even assuming that Ford perceived Johnson as having a disability, Johnson nevertheless fails to show that he was qualified to perform the essential functions of his job. Johnson's own psychiatrist labeled him unable to work and placed him on one-month medical leave. As made clear, "the ADA applies only to those who can do the Job[.]" *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003). Moreover, upon his resignation, Johnson immediately filed for and received Social Security Disability benefits, claiming to be unable to work or maintain employment. The Seventh Circuit has recognized that "a claimant's sworn statement in an application for disability benefits that he is unable to work would negate an essential

element of the claimant's ADA case—that he is a qualified individual with a disability." *Devine v. Bd. of Com'rs of Elkhart Cnty.*, 49 Fed. Appx. 57, 61 (7th Cir. 2002). Johnson asserts, however, that he filed for Social Security benefits one month after the alleged incident on April 4, 2014, and that at that time of the incident he was fit to work. But again, on April 4, 2014, his own doctor told him otherwise and rendered him unable to work. He has thus failed to reconcile his medical leave of absence and his subsequent filing of Social Security benefits with the ADA claim he now brings. The evidence viewed in the light most favorable to Johnson demonstrates that Ford is entitled to judgment as a matter of law on the ADA claim.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Ford's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 1/11/2019